238 P.3d 1201 (2010)
PACIFIC TOPSOILS, INC., a Washington Corporation, Appellant,
Dave Forman, an individual, Plaintiff,
v.
The WASHINGTON STATE DEPARTMENT OF ECOLOGY, a Division of the State of Washington, Respondent.
No. 39691-2-II.
Court of Appeals of Washington, Division 2.
August 24, 2010.
*1203 Jane Ryan Koler, Law Office of Jane Ryan Koler PLLC, Gig Harbor, WA, for Appellant.
Joan Margaret Marchioro, Wa. State Atty General's Ofc/Ecology Div., Olympia, WA, for Respondent.

PART PUBLISHED OPINION
WORSWICK, J.
¶ 1 Pacific Topsoils, Inc. (PTI) appeals from a Pollution Control Hearings Board (Board) order upholding fines assessed against PTI by the Washington State Department of Ecology (DOE) for filling wetlands without proper permits. PTI argues: (1) the DOE lacks statutory authorization to regulate wetlands under RCW 90.48.080; (2) chapter 90.48 RCW and WAC 173-201A-300 are unconstitutionally vague as to filling wetlands; (3) the DOE's Order 4095 and Penalty 4096 violated due process by failing to provide PTI with proper notice of the basis of the fines; (3) the Board violated PTI's due process rights by enforcing arbitrary time limits during its hearing, thus preventing it from cross-examining witnesses and calling surrebuttal witnesses; and (4) several of the Board's conclusions contain errors of law and substantial evidence does not support most of its findings. We reject PTI's arguments and affirm the Board's order.

FACTS

Procedural Facts
¶ 2 PTI, a soil processing company, owns property on Smith Island in Snohomish County. Smith Island has large areas of historically documented wetlands. A wetland study previously performed on Smith Island described it as a "mosaic of wetlands." Transcript of Proceedings (TP) (Feb. 20, 2008) at 68.
*1204 ¶ 3 PTI planned to expand its Smith Island operations. As part of its plans, PTI placed approximately 12 acres of fill material on the site without permits of any kind. The fill pile, estimated to be 15 to 17 feet deep and 75,000 to 150,000 cubic yards, would require 15,000 dump truck loads to remove. PTI did not test the fill material for contaminants prior to placing it at the site.
¶ 4 On October 16, 2006, the DOE received a complaint about PTI's activities on Smith Island. The DOE assigned Wetland Specialist Paul Anderson to investigate the complaint. After a site visit on October 27, Anderson determined that PTI had filled wetlands. At the conclusion of his site visit, he informed PTI's Environmental Director, Janusz Bajsarowicz, of his conclusion and requested a wetland delineation. Bajsarowicz informed Anderson that PTI's consulting firm, Parametrix, was preparing a wetland delineation. Over the next four months, the DOE made several requests to PTI for the wetland delineation, but PTI did not provide it.
¶ 5 On March 7, 2007, the DOE issued Order 4095, which stated in pertinent part:
On or before October 17, 2006, approximately 12 acres of fill material was discharged into wetlands at the [PTI] facility on Smith Island, Snohomish County. There is no record at the Department or Snohomish County of the submission of a permit application for the placement of said fill, nor a record of any permit for the placement of fill in the wetlands having been issued. Under RCW 90.48.080 and RCW 90.48.160, it is unlawful to discharge polluting matters into waters of the state without a permit. Discharge of such polluting matters into waters of the state is also a violation of the anti-degradation policy, WAC 173-201A-300.
Administrative Record (AR) at 1602. Order 4095 also stated that the DOE issued it under RCW 90.48.120(2) and specified compliance requirements for PTI.
¶ 6 On the same day, the DOE also issued an $88,000 civil penalty to PTI, Penalty 4096. Penalty 4096 provided that the DOE issued it under RCW 90.48.144(3), and it read in pertinent part:
Prior to January 24, 2006, fill was placed in approximately 12 acres of wetlands at [PTI]'s Smith Island facility without a permit in violation of RCW 90.48.080. Discharge of such polluting matters into waters of the state is also a violation of the anti-degradation policy, WAC 173-201A-300. Fill remains in place in the wetlands. Each and every day the fill remains in the wetlands constitutes a separate and distinct violation of RCW 90.48.080 and 90.48.160, and WAC 173-201A-300.
AR at 1605.
¶ 7 PTI appealed Order 4095 and Penalty 4096 to the Board. The Board's prehearing order, dated May 11, 2007, required the submission of hearing briefs and specified that they not exceed 15 pages. The prehearing order also provided that the parties could obtain relief from the page limit only by motion and set September 6, 2007, as the filing deadline for dispositive motions.
¶ 8 On February 13, 2008, PTI filed a 61 page brief, as well as numerous attachments. The DOE moved to strike the brief for its noncompliance with the prehearing order.
¶ 9 In granting the motion to strike, the Board articulated factors supporting its decision, including that the brief raised constitutional issues outside its jurisdiction and that PTI had not filed any dispositive motions on the legal arguments raised. The Board also identified the purposes of a hearing brief and found that PTI's brief went beyond those purposes. The Board granted the motion to strike but allowed PTI to submit a hearing brief conforming to the prehearing order's page limits.
¶ 10 The Board originally scheduled one day for the hearing but extended the allotted time to two days at PTI's request. During a prehearing conference call, at PTI's request, the Board agreed to provide six hours of hearing time per day, rather than the normal five and one-half hours. The parties agreed to split the allotted time equally, and the Board used a clock to keep track of the time. PTI made no further requests for additional hearing time before the hearing.
*1205 ¶ 11 At the hearing, the DOE presented its case first, because it bore the burden of proof, and reserved time for rebuttal. After PTI cross-examined the DOE's witnesses; presented its responsive case; and, on the second day, exceeded its allotted time by 25 minutes, the Board on its own motion granted PTI an additional 45 minutes to present its case "in the interests of trying to make sure this is a fair proceeding that allows sufficient time for [PTI] to finish up its case." TP (Feb. 21, 2008) at 474-75. PTI did not argue that the extra time allotted was insufficient or that it could not present the remainder of its case.
¶ 12 Following presentation of its last witness, PTI rested. PTI did not assert that it needed additional time; instead, it indicated that it would use its remaining time to cross-examine the DOE's rebuttal witnesses. Only after exhausting this remaining additional time did PTI orally request additional hearing time, arguing that it needed this additional time to present surrebuttal witnesses. The Board denied this oral motion and PTI's subsequent written motion for an extension of the hearing.
¶ 13 Ultimately, the Board fully affirmed Order 4095 and Penalty 4096. PTI then appealed the Board's order to the trial court, which affirmed the Board's order in full. The trial court also denied PTI's due process and vagueness challenges. PTI appeals.

Substantive Facts
¶ 14 A wetland is a transitional land that lies between terrestrial and aquatic systems where the water table is at or near the surface or where water covers the land. Three indicators confirm the existence of a wetland: (1) hydrophytic vegetation adapted to saturated soil conditions, (2) hydric soils, and (3) hydrology. WAC 173-22-080(1).
¶ 15 The Washington State Wetland Delineation and Identification Manual requires use of the "atypical situations methodology" for wetland delineation to determine the previous existence of a wetland and to decide where a wetland boundary existed in the past when it is no longer obvious in the present due to unauthorized alteration of one or more wetland indicators.[1] Because the presence of unauthorized fill material had altered previous site characteristics and conditions, the manual required the use of the atypical situations methodology. Both Anderson and PTI's consultant, Parametrix, used that methodology in their contemporaneous site investigations. Their investigations found the presence of all three wetland indicators.
¶ 16 First, both the DOE and Parametrix wetland specialists determined that, although the vegetation that existed before the fill replacement was no longer present under the fill, the wetland vegetation surrounding the fill represented what once grew on the filled areas. Specifically, the Parametrix report stated:
A distinction between vegetative communities present in undisturbed wetland areas and filled wetland areas was not observed in review of aerial photographs, indicating fill areas previously were vegetated with a similar hydrophytic vegetative community found throughout undisturbed portions of the wetland.
AR at 1645. Additionally, the site contained a small, unfilled area situated within a slight depression and surrounded on all sides by fill material. Observations of its plant species regeneration, buried plant material, and native soil layers, as well as review of historic aerial photographs, established that this small area is a wetland and is representative of the adjacent surrounding land under the fill.
¶ 17 Second, the atypical situations methodology requires a description and analysis of the site alteration and its effects on the soils and a characterization of soils that previously occurred, including the buried soils when fill material has been placed over the original soil. Indicators of hydric soils include observations of surface water or saturated *1206 soils and the listing of the soil as a hydric soil.
¶ 18 The National Cooperative Soil Survey describes the soils at the site as Puget silty clay loam, a hydric soil. Furthermore, the presence of oxidized rhizospheres along living roots, composed of oxidized iron concentrations, are evidence of current or recent soil saturation. Investigations by the DOE, Parametrix, and PTI's wetlands expert, James Kelley, indicated the presence of oxidized rhizospheres in the soils surrounding living roots. Oxidized rhizospheres on living plant roots are a primary wetland hydrology indicator. The presence of oxidized rhizospheres on live roots indicates that wetland hydrology is active and present and that hydric soil indicators are a contemporary, not relict, feature. Furthermore, Parametrix's report indicated the presence of hydric soil indicators such as "low chroma colors, presence of redoximorphic features, and high organic content."[2] AR at 1644.
¶ 19 Finally, under the atypical situations methodology, to determine whether wetland hydrology previously occurred on a site, investigators must examine site alterations, the effects of alterations on area hydrology, and characteristics of hydrology that previously existed in the area. Evidence that hydrology existed prior to site alteration satisfies the hydrology criteria. Investigators may rely on indicators such as the presence of oxidized rhizospheres, sediment deposits (including dried algae), surface scouring, and soil survey data indicating positive wetland hydrology.
¶ 20 The DOE and Parametrix investigated the historic record. Although the site had been drained with dikes and ditches in the past for farming, these efforts were never completely successful. Photographic evidence from 1947 on shows the presence of water on the site for many years. The National Wetlands Inventory (Wetlands Inventory) of the United States Department of Fish and Wildlife Services identifies wetlands on much of the site. Additionally, the DOE's investigations indicated the presence of oxidized rhizospheres on live plant roots in the site's soil. Parametrix reviewed aerial photographs in addition to its field observations of inundation, saturation to the surface, oxidized rhizospheres, and landscape hydrologic patterns, and concluded this evidence indicated "a historic continuity of hydrologic regimes between wetland fill areas and undisturbed wetland areas." AR at 1645.
¶ 21 The DOE concluded that PTI had filled wetlands at its Smith Island site. Parametrix reached the same conclusion in its report. Parametrix identified and delineated two wetlands on the site and concluded that approximately 7.81 acres of wetlands were mechanically graded or filled with non-native soils. Although the site's wetlands do not provide high quality habitat, they do provide water quality and hydrologic functions by slowing down the water flow, absorbing pollutants, and decreasing the amount of potential erosion. Additionally, according to PTI's soil expert, the fill compacted the soil beneath it by a minimum of two feet.

ANALYSIS

Excluded Evidence
¶ 22 We do not consider appendices that are not part of the administrative record or factual assertions they supported. RAP 10.3(a)(8) ("[a]n appendix [to a brief] may not include materials not contained in the record on review without permission from the appellate court, except as provided in rule 10.4(c)"). Appendices 6 and 24 and one page of appendix 9 to the Appellant's Brief, marked "preliminary," are not part of the administrative record and we do not consider them.
¶ 23 Also, PTI, citing to RCW 34.05.562(1)[3] and a motion before the trial *1207 court, contends that the trial court erred when it denied its motion to expand the record to include documents relating to a settlement agreement entered into with Snohomish County after the Board hearing, because these documents undermine several of the Board's findings and conclusions. But the relevant facts relating to the Snohomish County action were before the Board. The trial court did not err in refusing to expand the record to include appendix 8 and we do not consider it here.

Statutory Authority

A. Waters of the State
¶ 24 PTI contends that the DOE possesses no statutory authority to impose fines for violations of chapter 90.48 RCW, the Water Pollution Control Act (WPCA), because the WPCA does not expressly include wetlands in its definition of "waters of the state." Appellant's Br. at 17. The DOE responds that it possesses the necessary statutory authority because RCW 90.48.020 includes wetlands as "other surface waters" in its definition of "waters of the state." Resp't's Br. at 18-25. We agree with the DOE.
¶ 25 We review the Board's orders under chapter 34.05 RCW, the Administrative Procedure Act. Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 76-77, 11 P.3d 726 (2000). We sit in the same position as the superior court and apply the standards of review in RCW 34.05.570(3) directly to the agency record. Postema, 142 Wash.2d at 77, 11 P.3d 726. We may grant relief where the agency makes an erroneous interpretation or application of law, substantial evidence does not support the order, or the Board issues the order on an arbitrary or capricious basis. Postema, 142 Wash.2d at 77, 11 P.3d 726; RCW 34.05.570(3)(d), (e), (i). The party asserting invalidity of agency action bears the burden of establishing such invalidity. Postema, 142 Wash.2d at 77, 11 P.3d 726; RCW 34.05.570(1)(a).
¶ 26 The error of law standard applies to statutory construction. Postema, 142 Wash.2d at 77, 11 P.3d 726; RCW 34.05.570(3)(d). Under this standard, we may substitute our interpretation of the law for the agency's interpretation. Postema, 142 Wash.2d at 77, 11 P.3d 726. Ultimately, it is for the courts to determine the meaning and purpose of a statute. Postema, 142 Wash.2d at 77, 11 P.3d 726. But because the legislature designated the DOE as the regulating agency for the state's water resources, Washington courts give "great weight" to the DOE's interpretation of relevant statutes and regulations. Port of Seattle v. Pollution Control Hearings Bd., 151 Wash.2d 568, 593, 90 P.3d 659 (2004).
¶ 27 Our fundamental objective in statutory interpretation is to give effect to the legislature's intent. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 9-10, 43 P.3d 4 (2002). If a statute's meaning is plain on its face, then we give effect to that plain meaning as an expression of legislative intent. State ex rel. Citizens Against Tolls (CAT) v. Murphy, 151 Wash.2d 226, 242, 88 P.3d 375 (2004). We discern plain meaning not only from the provision in question, but also from closely related statutes and the underlying legislative purposes. Murphy, 151 Wash.2d at 242, 88 P.3d 375. If a statute is susceptible to more than one reasonable interpretation after this inquiry, then the statute is ambiguous and we may resort to additional canons of statutory construction or legislative history. Campbell & Gwinn, 146 Wash.2d at 12, 43 P.3d 4.
¶ 28 We give effect to all statutory language, considering statutory provisions in relation to each other and harmonizing them to ensure proper construction. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 560, 14 P.3d 133 (2000). We avoid construing a statute in a manner that results in "unlikely, absurd, or strained consequences." Glaubach v. Regence BlueShield, 149 Wash.2d 827, 833, 74 P.3d 115 (2003). Instead, we favor an interpretation consistent with the spirit or purpose of the enactment over a literal reading that renders the statute ineffective. Glaubach, *1208 149 Wash.2d at 833, 74 P.3d 115. In statutory construction, "includes" is a term of enlargement, while "means" is a term of limitation. Queets Band of Indians v. State, 102 Wash.2d 1, 4, 682 P.2d 909 (1984).
¶ 29 In 1945, the legislature enacted the WPCA. Laws of 1945, ch. 216. The purpose of the WPCA is "to maintain the highest possible standards to insure the purity of all waters of the state." RCW 90.48.010. In defining "waters of the state," RCW 90.48.020 provides that the phrase "shall be construed to include lakes, rivers, ponds, streams, inland waters, underground waters, salt waters and all other surface waters and watercourses within the jurisdiction of the state of Washington." RCW 90.48.030 grants the DOE "the jurisdiction to control and prevent the pollution of streams, lakes, rivers, ponds, inland waters, salt waters, water courses, and other surface and underground waters of the State of Washington."
¶ 30 RCW 90.48.080 further provides that
[i]t shall be unlawful for any person to throw, drain, run, or otherwise discharge into any of the waters of this state, or to cause, permit or suffer to be thrown, run, drained, allowed to seep or otherwise discharged into such waters any organic or inorganic matter that shall cause or tend to cause pollution of such waters according to the determination of the department, as provided for in this chapter.
The legislature authorized the DOE to enforce the WPCA by the issuance of orders and imposition of penalties for violations of RCW 90.48.080 and "orders adopted or issued pursuant to ... [this] chapter[]." RCW 90.48.120, .140, .144(3).
¶ 31 Furthermore, RCW 90.48.035 authorizes and requires the DOE to promulgate
rules and regulations as it shall deem necessary to carry out the provisions of this chapter, including but not limited to rules and regulations relating to standards of quality for waters of the state and for substances discharged therein in order to maintain the highest possible standards of all waters of the state in accordance with the public policy as declared in RCW 90.48.010.
In accordance with the legislative mandates of RCW 90.48.010 and .035, the DOE developed water quality standards for protection of Washington's ground water and surface water. WAC 173-200-010; WAC 173-201A-010. The DOE's water quality standards define "surface waters of the state" to include "lakes, rivers, ponds, streams, inland waters, saltwaters, wetlands and all other surface waters and water courses within the jurisdiction of the state of Washington." WAC 173-201A-020.[4] These water quality standards define "wetlands" as
areas that are inundated or saturated by surface water or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.
WAC 173-201A-020 (emphasis added). Both surface and ground water are "waters of the state." RCW 90.48.020.
¶ 32 RCW 90.48.010 expresses the legislature's intent that the DOE protect "all waters of the state." The legislature indicated the broad scope of this intent by its choice of the enlarging term "include" which modifies the phrase "all other surface waters" in its definition of "waters of the state." RCW 90.48.020. RCW 90.48.035 authorizes and requires the DOE to issue regulations it determines are necessary to protect the quality of "waters of the state." Accordingly, the DOE issued regulations that reflected its determination that wetlands contain "surface water *1209 or ground water," that this brings wetlands within the definition of "surface waters of the state" and, therefore, that wetlands must be protected under the WPCA. WAC 173-201A-020. Thus, the plain language of the WPCA clearly indicates that the DOE acts within its statutory authority over "waters of the state" when it regulates wetlands.

B. Other Statutes
¶ 33 PTI next contends that interpreting the WPCA as granting the DOE jurisdiction over wetlands conflicts with legislative grants of jurisdiction over wetlands to local authorities in chapter 36.70A RCW, the Growth Management Act, and chapter 90.58 RCW, the Shoreline Management Act of 1971, and argues that chapters 90.74, Aquatic Resources Mitigation, and 90.84 RCW, Wetlands Mitigation Banking, express the legislature's intent to limit the DOE's jurisdiction over wetlands. PTI also contends that the DOE's interpretation of wetlands as "surface waters of the state" ignores statutory language recognizing wetlands as land, not water. We disagree.
¶ 34 The legislature enacted the WPCA in 1945; it enacted the Shoreline Management Act in 1971, Laws of 1971, 1st Ex. Sess., ch. 286; it enacted the Growth Management Act in 1990, Laws of 1990, 1st Ex.Sess., ch. 17; it enacted chapter 90.74 RCW in 1997, Laws of 1997, ch. 424; it enacted chapter 90.84 RCW in 1998, Laws of 1998, ch. 248. PTI argues that these later statutes repeal or amend the earlier-enacted WPCA. But the law does not favor repeal by amendment or implication, and there is no repeal or amendment by implication when statutes can be harmonized. Misterek v. Wash. Mineral Prods., Inc., 85 Wash.2d 166, 168, 531 P.2d 805 (1975).
¶ 35 Here, none of the statutes cited by PTI contains an express prohibition of the DOE's jurisdiction over wetlands under the WPCA. Further, none of the statutes implicitly conflicts with the DOE's jurisdiction over wetlands as "waters of the state" under the WPCA. PTI correctly states that RCW 90.58.030(f) includes wetlands within its definition of "shorelands" under the Shoreline Management Act of 1971. But accepting PTI's contention that RCW 90.58.030(f) requires us to consider wetlands only as land would ignore the DOE's mandate to protect "all waters of the state," including "other surface waters," under the WPCA.[5] RCW 90.48.010, .020.
¶ 36 Likewise, no statutory conflicts arise from an interpretation of shared jurisdiction between the DOE and local authorities over wetlands. The Growth Management Act requires local authorities to create comprehensive plans for land use and development that must include measures protecting "critical areas" such as wetlands. RCW 36.70A.030,.070(5)(c)(iv). The legislature's requirement that local authorities create critical areas regulations as part of their comprehensive plans does not demonstrate an intent to divest the DOE of wetlands jurisdiction under other statutes. Further, as noted by our Supreme Court, the legislature delegated enforcement power under the Shoreline Management Act of 1971 to the DOE.[6]Ass'n of Rural Residents v. Kitsap County, 141 Wash.2d 185, 189 n. 1, 4 P.3d 115 (2000); RCW 90.58.140, .300. For all these reasons, we hold that the DOE's jurisdiction over wetlands under the WPCA is harmonious with these statutes.

Vagueness
¶ 37 PTI next contends that the WPCA is unconstitutionally vague as applied to placing *1210 fill material into wetlands because (1) the statute provides no notice that it includes wetlands as "waters of the state" and (2) it provides no notice that "pollution" includes fill placement. Appellant's Br. at 32-35. It further contends that WAC 173-201A-300, the water antidegradation policy, provides no notice that it applies to the filling of wetlands.[7] Again, we disagree.
¶ 38 Washington courts have applied the void for vagueness doctrine to prohibitory land use regulations. See Burien Bark Supply v. King County, 106 Wash.2d 868, 871, 725 P.2d 994 (1986). We review a statute's constitutionality de novo. Putman v. Wenatchee Valley Med. Ctr., 166 Wash.2d 974, 978, 216 P.3d 374 (2009). We presume a statute's constitutionality. Haley v. Med. Disciplinary Bd., 117 Wash.2d 720, 739, 818 P.2d 1062 (1991). A challenger bears the burden of proving beyond a reasonable doubt that a statute is unconstitutionally vague. Haley, 117 Wash.2d at 739, 818 P.2d 1062.
¶ 39 We consider a statute void for vagueness if its terms are "so vague that persons `of common intelligence must necessarily guess at its meaning and differ as to its application'." Haley, 117 Wash.2d at 739, 818 P.2d 1062 (quoting Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). But because "[s]ome measure of vagueness is inherent in the use of language," Haley, 117 Wash.2d at 740, 818 P.2d 1062, we do not require "impossible standards of specificity or absolute agreement." City of Spokane v. Douglass, 115 Wash.2d 171, 179, 795 P.2d 693 (1990). Mere uncertainty does not establish unconstitutional vagueness. Douglass, 115 Wash.2d at 179, 795 P.2d 693. Given this, a statute meets a vagueness challenge "[i]f persons of ordinary intelligence can understand what the ordinance proscribes, notwithstanding some possible areas of disagreement." Douglass, 115 Wash.2d at 179, 795 P.2d 693.
¶ 40 Furthermore, undefined terms in a statute do not automatically render it unconstitutionally vague. Douglass, 115 Wash.2d at 180, 795 P.2d 693. For clarification, citizens may need to resort to other statutes or court opinions, which we consider "`[p]resumptively available to all citizens'." Douglass, 115 Wash.2d at 180, 795 P.2d 693 (alternation in original) (quoting State v. Smith, 111 Wash.2d 1, 7, 759 P.2d 372 (1988)).
¶ 41 First, as we discussed above, RCW 90.48.020 includes "all other surface waters" in its definition of "waters of the state." WAC 173-201A-020 defines wetlands as "areas that are inundated or saturated by surface water or ground water" and includes wetlands within the definition of "surface waters of the state." These statutes and regulations were presumptively available to PTI. Thus, the WPCA's application to wetlands is not unconstitutionally vague.
¶ 42 Second, the WPCA defines pollution in pertinent part to include the
alteration of the physical, chemical or biological properties, of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge of any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful, detrimental or injurious to the public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish, or other aquatic life.
RCW 90.48.020. The common definition of "alter" is "to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else." Webster's Third New International Dictionary 63 (2002).
¶ 43 Here, both the DOE and Parametrix wetland specialists determined that the vegetation that existed before PTI placed the fill on the site was no longer present under the fill material. Further, the fill material compressed the soil beneath it by a minimum of *1211 two feet. People of ordinary intelligence would understand both facts as alterations of the physical properties of a wetland. Likewise, such acts, by destroying the vegetation essential for the wetlands' water quality and hydrologic functions, fall within the common understanding of discharge of a solid detrimental to the "legitimate beneficial uses" of this wetland.[8] RCW 90.48.020. Thus, the definition of "pollution" under the WPCA is not vague as applied to placement of fill material into wetlands. RCW 90.48.020.
¶ 44 Finally, the DOE's antidegradation policy provides that it is "guided" by chapters 90.48 and 90.54 RCW. WAC 173-201A-300(1). RCW 90.54.020(3)(b) provides in pertinent part that "[n]otwithstanding that standards of quality established for the waters of the state would not be violated, wastes and other materials and substances shall not be allowed to enter such waters which will reduce the existing quality thereof." Furthermore, the antidegradation policy states that it applies "to human activities that are likely to have an impact on the water quality of a surface water" and that part of its purpose, which applies to "all waters and all sources of pollution," is to "ensure existing and designated uses are maintained and protected." WAC 173-201A-300(2)(c), (2)(e)(i).
¶ 45 Again, these other statutes and regulations were presumptively available to PTI. For the reasons we discussed above, a person of ordinary intelligence would understand them and the antidegradation policy, when read together, as applying to the filling of wetlands. Thus, we hold that the antidegradation policy is not unconstitutionally vague as applied to PTI.
¶ 46 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.[9]
We concur: PENOYAR, C.J., and SWEENEY, J.
NOTES
[1] PTI's wetlands expert, James Kelley, testified that the manual required use of the "problem area methodology" for delineation of the site's unfilled areas because they were seasonal wetlands and that other background materials called for use of the method because of alteration of the site's hydrology from historical, legal human activity, such as diking. TP (Feb. 21, 2008) at 357. But the DOE presented evidence that Smith Island is not a seasonal wetland area.
[2] See also WAC 173-22-080(7) (defining hydric soil indicators).
[3] RCW 34.05.562 provides:

(1) The court may receive evidence in addition to that contained in the agency record for judicial review, only if it relates to the validity of the agency action at the time it was taken and is needed to decide disputed issues regarding:
(a) Improper constitution as a decision-making body or grounds for disqualification of those taking the agency action;
(b) Unlawfulness of procedure or of decision-making process; or
(c) Material facts in rule making, brief adjudications, or other proceedings not required to be determined on the agency record.
[4] The DOE's water quality standards are similar to those of the federal government. The federal Clean Water Act (CWA) prohibits the discharge of pollutants into navigable waters. 33 U.S.C. § 1311(a). The CWA defines "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Federal regulations promulgated by the United States Army Corps of Engineers (Corps) and Environmental Protection Agency (EPA) define "waters of the United States" as including "[a]ll interstate waters including interstate wetlands." 33 C.F.R. § 328.3(a)(2); 40 C.F.R. § 122.2(b). Thus, the DOE's water quality standards, like the Corps' and EPA's regulations, identify wetlands as "waters of the state" or "waters of the United States."
[5] Additionally, as a matter of common sense, the fact that one may consider wetlands as both land and water is inherent in the nature of wetlands. PTI's interpretation would lead to an absurd result.
[6] PTI also contends that RCW 90.48.260 limits the DOE's wetlands jurisdiction to its role in issuing water quality certification permits as part of the federal CWA. But RCW 90.48.144(3), the WPCA's penalty provision, provides in pertinent part:

[E]very person who ... [v]iolates the provisions of RCW 90.48.080, or other sections of this chapter or chapter 90.56 RCW or rules or orders adopted or issued pursuant to either of those chapters, shall incur, in addition to any other penalty as provided by law, a penalty in an amount of up to ten thousand dollars a day for every such violation.
The plain text of RCW 90.48.144(3) indicates that the DOE possesses authority under RCW 90.48.080, independent of any other statute, to regulate waters of the state, including wetlands.
[7] Neither the Board nor the superior court entered a conclusion of law that PTI violated the antidegradation policy. The Board did conclude that PTI violated the DOE's wetland regulations "as contained in WAC 173-22." AR at 1232.
[8] RCW 90.54.020(1), which declares fundamental principles for "[u]tilization and management of the waters of the state," provides in pertinent part that "[u]ses of water for ... preservation of environmental and aesthetic values ... [are] beneficial."
[9] In the unpublished portion of this opinion, we reject PTI's contention that Order 4095, Penalty 4096, and the Board's hearing procedures violated PTI's due process rights. We also reject PTI's contentions that substantial evidence does not support the Board's findings and that the Board's conclusions of law were erroneous.