FILED
COURT OF APPEALS
DIVISION II

2013 SEP 24 AM 9: 29

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SSHI LLC, a Delaware limited liability corporation, dba DR Horton, | No. 43300-1-II |
| Appellant, | |
| v. | |
| CITY OF OLYMPIA, a Washington municipal corporation, | UNPUBLISHED OPINION |
| Respondent, | |
| OLYMPIA SAFE STREETS CAMPAIGN, a Washington nonprofit corporation, | |
| Intervenor. | |

JOHANSON, J. — Developer DR Horton appeals from the trial court's order dismissing DR Horton's land use petition that challenged the city of Olympia's (City) denial of DR Horton's master plan application; it also appeals the trial court's final judgment dismissing all of DR Horton's claims against the City. DR Horton had planned to build the densely populated Trillium neighborhood village in Olympia. The Olympia City Council (Council) denied the Trillium master plan because the master plan failed to comply with the City's transit requirements; the Council also concluded that the administrative record was inadequate to determine whether the master plan was consistent with City policies involving school sites and

capacity as well as pedestrian and bicycle connectivity. DR Horton appeals the trial court order affirming the Council's decision, arguing that the Council erred in (1) denying the Trillium master plan due to the plan's failure to satisfy transit requirements, (2) reserving for the future its decision regarding placement of a school site, and (3) determining that DR Horton provided inadequate evidence to demonstrate that the Trillium master plan was consistent with the City's pedestrian and bicycle connectivity requirements. Intervenor Olympia Safe Streets Campaign (OSSC) argues that we should affirm the Council's determination that Trillium did not satisfy connectivity requirements.

We conclude that DR Horton does not demonstrate that the Council erred. Accordingly, we affirm the Council's administrative denial of DR Horton's Master Plan application and, in turn, the trial court's dismissal of DR Horton's land use petition. We also award attorney fees to the City and OSSC as prevailing parties on appeal.

## FACTS

Trillium is DR Horton's proposed 80-acre Olympia development that would include approximately 300 single-family homes and 200 multifamily units. In 1994, the City, under its municipal code and comprehensive plan, zoned and designated the Trillium site as a "Neighborhood Village." Administrative Record (AR) at 5844-46. Builders must develop neighborhood villages as "master planned developments" and comply with a variety of regulations. AR at 5845.

In 2010, the City planning staff recommended approval of the Trillium proposal to the hearing examiner. At hearings held in June and July 2010, the hearing examiner considered evidence from individuals, including representatives from OSSC, that the Trillium proposal

failed to comply with the City code and comprehensive plan because of outsized blocks, lack of bicycle/pedestrian lanes, inadequate local schools, and the absence of required public transit.

The hearing examiner asked Intercity Transit for information regarding existing and anticipated bus routes that would serve Trillium. Intercity Transit's planning manager confirmed that there was no existing transit service to the Trillium site, that the nearest existing stop was at least .38 miles away, and that it did not anticipate adding fixed route service to Trillium until the City extended Log Cabin Road, an event without a timetable.

In October 2010, the hearing examiner recommended that the Council deny the Trillium master plan based on its failure to satisfy City code transit requirements and its failure to comply with comprehensive plan policies regarding public transit, school capacity, block size and street spacing, and bicycle and pedestrian connectivity. The hearing examiner found that transit service would "reach Trillium only at some indefinite and undetermined point in the future," and he acknowledged that code requirements and comprehensive plan policies could be satisfied if regular bus service to Trillium were certain at some stage in the development's growth. AR at 5950. But he ultimately found that the master plan did not meet the transit requirement because the evidence demonstrated that such service depended on "unpredictable contingencies." AR at 5952.

In November 2010, DR Horton and the City planning department filed reconsideration motions with the hearing examiner. In April 2011, the hearing examiner issued his recommendation, determining that the Trillium master plan was no longer inconsistent with the City code's connectivity requirements. He also rescinded his previous findings and conclusions concerning school capacity after hearing testimony regarding an enrollment decrease in Olympia

elementary schools. Regardless, he again recommended denying the Trillium master plan because of its failure to comply with public transit requirements.

In June and July 2011, the Council considered the hearing examiner's recommendations. The Council, in passing Ordinance No. 6762, reviewed the parties' written submissions and heard several oral presentations before voting to adopt the hearing examiner's recommended denial of the Trillium master plan. The Council noted that the high-density neighborhood envisioned for a neighborhood village relied on public transit availability.

The Council adopted all of the hearing examiner's findings and almost all of his conclusions regarding bicycle and pedestrian connectivity. After performing its own review, however, the Council concluded that the record was inadequate to determine that Trillium's master plan proposal satisfied neighborhood village connectivity requirements under the municipal code or comprehensive plan. The Council also found the record inadequate to determine whether Trillium was consistent with the comprehensive plan involving school sites.

In August 2011, DR Horton filed a land use petition and complaint for damages against the City, challenging the Council's adoption of Ordinance No. 6762. That same month, OSSC petitioned the trial court to intervene as a party plaintiff on the connectivity issue, and, in September, the trial court granted OSSC intervenor status based on the parties' stipulation. In March and June 2012, the trial court issued orders dismissing all claims related to DR Horton's land use petition. DR Horton now appeals the trial court's March and June 2012 orders.

ANALYSIS

I. DENIAL OF MASTER PLAN BASED ON FIXED-ROUTE, PUBLIC BUS SERVICE

DR Horton first claims that the Council erred in denying the Trillium master plan because the Council based its decision on unwritten and undefined requirements that Intercity Transit provide fixed route transit service to Trillium. Specifically, DR Horton argues that (1) the Council misapplied its zoning requirements because the City code requires nothing more than a sheltered transit stop, (2) the City lacks public transit concurrency standards, (3) the Council has never required fixed-bus service as a condition for master plan approval, (4) the Council erred in evaluating the Trillium master plan for consistency with the comprehensive plan, (5) the Council's denial was unlawfully vague and impossible to meet, and (6) the Council's denial amounted to an unconstitutional taking of DR Horton's property and deprived DR Horton of substantive due process. Because the Council is entitled to considerable deference in its construction of its ordinances, we hold that DR Horton failed to demonstrate that the Council erred in applying its ordinances and denying the Trillium master plan.

A. Standards of Review and Rules of Law

1. Land Use Petition Actions

Under the Land Use Petition Act[1] (LUPA), we stand in the same position as the trial court in reviewing a land use decision. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). A LUPA petitioner must demonstrate error under one of six standards for relief:

---

[1] Ch. 36.70C RCW.

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1). The standards described in subsections (a), (b), (e), and (f) present questions of law that we review de novo. *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011). The substantial evidence standard in subsection (c) requires a "sufficient quantum of evidence" in the record to persuade a reasonable person that the declared premise is true when viewed in light of the whole record, after drawing inferences from the evidence in a light most favorable to the decision by the highest forum exercising fact-finding authority. *Phoenix Dev., Inc.*, 171 Wn.2d at 831. And under subsection (d), a finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been committed. *Phoenix Dev., Inc.*, 171 Wn.2d at 829.

### 2. Reviewing Municipal Ordinances

We construe municipal ordinances according to statutory construction rules. *Ford Motor Co. v. City of Seattle, Exec. Servs. Dep't*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007), *cert. denied*, 552 U.S. 1180 (2008). Where a statute is clear on its face, we derive its plain meaning from the statute's language alone. *Ford Motor Co.*, 160 Wn.2d at 41. We perform statutory construction to effect the legislative intent and purpose in creating the statute, *Woods v. Kittitas County*, 162

Wn.2d 597, 607, 174 P.3d 25 (2007), and if possible, avoid unjust and absurd consequences. *Crown Zellerbach Corp. v. Dep't of Labor & Indus.*, 98 Wn.2d 102, 107, 653 P.2d 626 (1982). We also read the statute as a whole and harmonize statutory provisions, to the extent possible, to ensure proper construction of every provision and a unified statutory scheme. *City of Wenatchee v. Owens*, 145 Wn. App. 196, 205, 185 P.3d 1218 (2008), *review denied*, 165 Wn.2d 1021 (2009).

Statutory construction is a question of law that we review de novo. *Ford Motor Co.*, 160 Wn.2d at 41. When construing an ordinance, however, a "'reviewing court gives considerable deference to the construction of'" the challenged ordinance "'by those officials charged with its enforcement.'" *Ford Motor Co.*, 160 Wn.2d at 42 (quoting *Gen. Motors Corp. v. City of Seattle*, 107 Wn. App. 42, 57, 25 P.3d 1022 (2001)). In reviewing LUPA decisions, we review the "final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination." RCW 36.70C.020(2); *See Phoenix Dev., Inc.*, 171 Wn.2d at 837-38 ("Although the City staff concluded that the proposals complied with the comprehensive plan, it is the City's final decision that controls our review.").

B. Misapplication of Zoning Requirements

DR Horton asserts that the Council misapplied its own zoning requirements by mandating fixed route transit service when the City code requires nothing more than a sheltered transit stop site. We disagree and defer to the Council's reasonable construction of its zoning ordinances and comprehensive plan, which requires neighborhood villages to offer public transportation service.

We review de novo the Council's land use decision based on allegedly erroneous interpretations of law under RCW 36.70C.130(1)(b), *Phoenix Dev., Inc.*, 171 Wn.2d at 828; but

under this statute, we allow "for such deference as is due the construction of a law by a local jurisdiction with expertise," here the Council. *See* RCW 36.70C.130(1)(b).

The City code expressly requires "a sheltered transit stop" approved by Intercity Transit in each neighborhood village center. Olympia Municipal Code (OMC) 18.05.050(C)(1), (4). The City code also requires that neighborhood village centers be located along collector streets "to make them readily accessible for mass transit." OMC 18.05.050(C)(6)(b).

Both the City code and comprehensive plan purport to call for actual transit service to serve the sheltered transit stop. The City code expressly states the purposes of a neighborhood village zoning district, and actual public transportation routes would further these purposes, whereas sheltered transit stops without transit service would not. Neighborhood village zoning districts are intended, for example:

> 1. To enable development of integrated, mixed use communities, containing a variety of housing types arranged around a village center, which provide a pleasant living, shopping, and working environment; a sense of community; and a balance of compatible retail, office, residential, recreational, and public uses. . . .
> 2. To enable a land use pattern which will reduce dependence on auto use, especially drive-alone vehicle use during morning and evening commute hours.
> 3. To enable the design of new development in a manner which will ensure the safe and efficient movement of goods and people.
> 4. To require direct, convenient pedestrian, bicycle, and vehicular access between residences in the development and the village center, in order to facilitate pedestrian and bicycle travel and reduce the number and length of automobile trips.
> 5. To require sufficient housing density to enable cost-effective extension of utilities, services, and streets; frequent transit service; and to help sustain neighborhood businesses.
> 6. To enable many of the community's residents to live within one-fourth (1/4) mile of a grocery store and transit stop.

OMC 18.05.020. Based on these purposes, the City aspires to reduce automobile traffic congestion in its neighborhood villages by promoting pedestrian, bicycle, and "frequent transit

service." *See* OMC 18.05.020(5). A sheltered transit stop, alone, without transit service or any planned transit service at some stage in the development's growth, would appear inconsistent with these stated purposes; and, enabling residents to live within a quarter-mile of the transit stop, without an attached transit route, would be nonsensical.

Moreover, the City's comprehensive plan calls for new development projects to be designed to "allow people to get around easily by foot, bicycle, bus, or car," and neighborhood villages should encourage "walking, biking and use of mass transit." Comprehensive Plan ch. 1 at 18. The comprehensive plan lists several "Essential Neighborhood Characteristics" for neighborhood villages demonstrating the City's emphasis on public transit in new developments:

- Narrow, tree-lined streets . . . to make walking, bicycling, and travel by transit easy and interesting;
- A coordinated system of open space, parks and trails, with a neighborhood park within walking distance or a short transit ride of all residences;

. . .

- Neighborhood centers within walking distance or a short transit ride of most residences;

. . .

- Sufficient housing densities to enable frequent transit service and sustain neighborhood businesses.

Comprehensive Plan ch. 1 at 18-19. Also, each neighborhood village should have housing, shopping, jobs, and transit in close proximity to one another. Comprehensive Plan ch. 1 at 19.

The City's comprehensive plan further reflects the City's desire to "enable less reliance on automobiles" and "[r]educe dependence on auto use." Comprehensive Plan ch. 1 at 8; ch. 6 at 5. It outlines policies designed to reduce automobile reliance, many of which involve public transportation. One expressly states that the City desires its neighborhood villages to "make mass transit more viable." Comprehensive Plan ch. 1 at 8 (LU 3.3). The City must also work

9

with Intercity Transit to assure that "street standards, land uses, and building placement support the existing or planned [transit] services and facilities along identified routes" and "[p]rovide an appropriate level of reliable, effective public transportation options commensurate with the region's evolving needs." Comprehensive Plan ch. 6 at 11-12 (T 1.21, T 1.25). Finally, under the comprehensive plan, "New residential subdivisions, planned residential developments, and urban villages shall provide for efficient circulation patterns for public transportation. Intercity Transit should be consulted to assure that new development appropriately accommodates transit use." Comprehensive Plan ch. 6 at 25 (T 3.32).

Considering these policies, both the hearing examiner and the Council concluded that the City code requires actual bus service to serve the proposed Trillium neighborhood village, rather than merely a sheltered transit stop without transit service. The Council followed the hearing examiner, who reasoned:

> Without service, a transit stop would serve only as a sheltered seating area for pedestrians in the village green. If that were its purpose, the ordinance would have required that pedestrian amenity, not a transit stop. Its requirement of a transit stop means a stop that will in fact allow catching the bus.

AR at 5950.

A policy requiring a sheltered stop rather than actual bus service appears inconsistent with the comprehensive plan advocating mass transit, transit routes, and public transportation, as well as the City code. Accordingly, we defer to the Council and affirm its interpretation of its comprehensive plan and City code, which effectuate the City's goals and policies encouraging actual public transportation. The Council did not err in denying the Trillium master plan.

## C. Transit Concurrency Standards

DR Horton next argues that the City lacked public transit concurrency standards to support its denial of the Trillium master plan. DR Horton does not demonstrate error because the City had no obligation to create transit concurrency requirements.

Concurrency is the concept that an adequate level of service should be available concurrently with the development's impacts or within a reasonable time thereafter. *Whatcom County Fire Dist. No. 21 v. Whatcom County*, 171 Wn.2d 421, 428, 256 P.3d 295 (2011). Except for transportation concurrency, whether to adopt concurrency requirements is generally left to the planning authority's discretion. *Whatcom County Fire Dist. No. 21*, 171 Wn.2d at 428.

The City has adopted transportation concurrency standards. ch. 15.20 OMC. It has not, however, adopted transit concurrency standards. DR Horton contends that without an adopted transit concurrency standard, the City lacks authority to impose transit service requirements. DR Horton, however, confuses neighborhood village master plan standards with concurrency regulations. The City has no obligation to establish transit concurrency requirements. *See Whatcom County Fire Dist. No. 21*, 171 Wn.2d at 428. Ultimately, by law the City enjoys discretion in determining whether it wants to adopt such requirements. *See Whatcom County Fire Dist. No. 21*, 171 Wn.2d at 428. Thus, DR Horton's concurrency argument fails.

## D. History of Requiring Fixed-Bus Service

DR Horton next argues that the Council erred in requiring a commitment from Intercity Transit for fixed route transit service because the Council has never before required such a commitment. DR Horton does not demonstrate any error.

11

DR Horton cites two prior master plan proposals to support its claim, Bentridge and the Village at Mill Pond/Briarton. DR Horton asserts that, like Trillium, the Bentridge developer ensured that it would provide a sheltered bus stop at Bentridge even though the nearest fixed route public transit service would be over a quarter-mile away. And DR Horton further asserts that, for Mill Pond/Briarton, the Council never imposed public transit requirements; instead, it limited its review to ascertain whether the developer provided sheltered transit stops.

DR Horton's assertions are misplaced. In considering Trillium, the hearing examiner distinguished it from Bentridge because an Intercity Transit fixed route served Bentridge. Intercity Transit also committed to fixed route transit service for the Village at Mill Pond/Briarton. Trillium, however, lacked any public transit service. Accordingly, DR Horton's claims are unfounded.

### E. Consistency with Comprehensive Plan

DR Horton next argues that the Council erred as a matter of law when it evaluated the Trillium master plan for consistency with comprehensive plan standards and not the adopted City code standards. Master plan approval, however, does require consistency with the City's comprehensive plan.

If a local zoning code explicitly requires that a proposed land use comply with the local comprehensive plan, then the proposed use must satisfy both the zoning code and the comprehensive plan. *Woods*, 162 Wn.2d at 614. The City code here requires that the Council determine whether a proposed master plan conflicts with the comprehensive plan. OMC 18.57.080(D)(3); *see also* RCW 36.70B.030(1) (declaring that comprehensive plans "serve as the foundation for project review"). And, "[n]o land shall be subdivided or developed for any

purpose which is not in conformance with the Comprehensive Plan, any zoning ordinance or other applicable provisions of the Olympia Municipal Code." OMC 18.02.100. Because the City code expressly requires the Council to evaluate master plan proposals for consistency with the comprehensive plan, OMC 18.02.100; OMC 18.57.080(D)(3), the Council did not err in reviewing the Trillium master plan for consistency with the comprehensive plan.

## F. Vagueness

DR Horton next argues that the Council erred in denying the Trillium master plan because City policies were unlawfully vague.[2] DR Horton does not demonstrate beyond a reasonable doubt that City policies are unconstitutionally vague.

The void for vagueness doctrine may apply to prohibitory land use regulations. *Pac. Topsoils, Inc. v. Dep't of Ecology*, 157 Wn. App. 629, 646, 238 P.3d 1201 (2010), *review denied*, 171 Wn.2d 1009 (2011). A challenger bears the burden of proving beyond a reasonable doubt that a statute is unconstitutionally vague. *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 739, 818 P.2d 1062 (1991).

Here, DR Horton does not articulate what statute, specifically, is unconstitutionally vague. Therefore, DR Horton does not bear its burden of proving beyond a reasonable doubt that the City code is unconstitutional. *See Haley*, 117 Wn.2d at 739.

---

[2] DR Horton also appears to claim that the transit requirement imposes an impossible task on a developer—requiring a developer to obtain a guarantee from Intercity Transit, a body over which the developer has no control. DR Horton does not support its impossibility argument with authority. Thus, we do not address this issue. RAP 10.3(a)(6).

G. Unconstitutional Regulatory Taking and Substantive Due Process

DR Horton next argues that the Council's denial of the Trillium master plan amounted to an unconstitutional regulatory taking and violated DR Horton's substantive due process rights. But the Council's denial of the Trillium master plan does not constitute an unconstitutional taking because it was neither an unlawful exaction nor an unconstitutional deprivation of economic use.

A land use regulation that too drastically curtails owners' use of their property can cause a constitutional taking or a denial of substantive due process. *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 329, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990). We consider these alternative grounds separately and we independently analyze them because the remedies for each are different. *Presbytery of Seattle*, 114 Wn.2d at 329.

1. Regulatory Taking

To determine which of these two constitutional tests to use, we ask whether the regulation destroys any fundamental attributes of ownership—the right to possess, to exclude others, to dispose of property, or to make some economically viable use of the property. *Guimont v. Clarke*, 121 Wn.2d 586, 602, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994). If a landowner asserts a "physical invasion" or "total taking," and that assertion is not rebutted, the owner is entitled to just compensation to recover for the constitutional taking; however, if the owner fails to prove a "physical invasion" or "total taking," then there is no per se constitutional taking requiring just compensation. *Guimont*, 121 Wn.2d at 602-03.

Here, DR Horton alleges that the City's transit requirement infringes a fundamental property ownership attribute, a "total taking" of the property's economic viability, rendering the

site economically useless without any utility or marketability. The City rebuts DR Horton's argument, noting that DR Horton may request a rezone of the property site for more traditional residential development.[3] Because the City code provides a property owner other economically viable development options under OMC 18.05.050(A)(2), here a rezone, DR Horton does not demonstrate a "total taking" of all economically viable use of its Trillium site. Accordingly, the Council's denial of the Trillium master plan does not constitute an unconstitutional taking. *See Guimont*, 121 Wn.2d at 603.

### 2. Substantive Due Process

The Fourteenth Amendment prohibits states from depriving any person of life, liberty, or property, without due process of law. U.S. CONST. amend. XIV, § 1. To determine whether a regulation violates due process, we apply a three-part test to determine whether (1) the regulation is aimed at achieving a legitimate public purpose, (2) it uses means reasonably necessary to achieve that purpose, and (3) the regulation unduly oppresses the landowner. *Guimont*, 121 Wn.2d at 609. A party raising a substantive due process challenge bears the burden of proving unconstitutionality under this test. *Girton v. City of Seattle*, 97 Wn. App. 360, 363, 983 P.2d 1135 (1999), *review denied*, 140 Wn.2d 1007 (2000).

Our primary interest is with the "unduly oppressive" part of the analysis. *Presbytery of Seattle*, 114 Wn.2d at 331. This inquiry "lodges wide discretion in the court and implies a

---

[3] DR Horton acknowledged this option before the Council, "If transit service cannot be provided, and that is what the Council determines is the standard, then an infrastructure component cannot be provided to this property and a [rezone] then would be appropriate." AR Ex. 711 at 23-24.

balancing of the public's interests against those of the regulated landowner." *Peste v. Mason County*, 133 Wn. App. 456, 475, 136 P.3d 140 (2006), *review denied*, 159 Wn.2d 1013 (2007). We consider several factors as part of this analysis, including the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the regulation solves it, and the feasibility of less oppressive solutions. *Presbytery of Seattle*, 114 Wn.2d at 331. We also consider the amount and percentage of value lost; the extent of the remaining use; past, present, and future uses; the temporary or permanent nature of the regulation; the extent to which the owner should have anticipated such regulation; and the feasibility of the owner altering present or currently planned uses. *Presbytery of Seattle*, 114 Wn.2d at 331.

First, the public transit requirement serves a legitimate public purpose because it takes automobiles off the road and reduces traffic. Fewer automobiles yields safer streets, shorter commutes, reduced carbon emissions, and improved air quality, all legitimate public purposes.

Under the second part of the test, we note that a public transportation option is reasonably necessary to reduce this traffic congestion. Without fixed route transit service, Trillium's citizens have no reliable public option for leaving Trillium throughout a day, essentially forcing people to drive private automobiles if they need to travel beyond the neighborhood.

Third, we focus our primary interest on the "unduly oppressive" part of the test If Trillium lacks a public transportation option, then the residents and visitors in its densely populated, 500-unit neighborhood village, have limited transportation options. Public transportation offers Trillium's residents and visitors the option to come and go and maintain their independence, without requiring a private automobile. And though DR Horton did not

satisfy the public transportation infrastructure requirement at the Trillium site, it acknowledged that it may request a rezone to a more standard residential development; thus, the 80-acre development site still retains considerable value. Accordingly, the public transportation requirement does not appear to be unduly oppressive.

DR Horton contends that the public transit requirement is not based in a legitimate public purpose, nor is it needed to resolve a public problem. A public transit requirement, however, aims to reduce greenhouse gases, like carbon dioxide. *See*, Darren A. Prum & Sarah L. Catz, *Greenhouse Gas Emission Targets and Mass Transit: Can the Government Successfully Accomplish Both Without a Conflict?*, 51 SANTA CLARA L. REV. 935, 935-36 (2011). And, carbon emissions are a legitimate public concern. *See* J.B. Ruhl & James Salzman, *Climate Change Meets the Law of the Horse*, 62 DUKE L.J. 975, 1003 (2013). Accordingly, DR Horton does not carry its burden of proving the unconstitutionality of the public transit requirement. Therefore, DR Horton does not demonstrate that the Council violated DR Horton's substantive due process. *See Girton*, 97 Wn. App. at 363.

## II. RESERVING FUTURE SCHOOL SITE DECISION

DR Horton next claims that nothing requires the Council to analyze a master plan's consistency with comprehensive plan policies; and consequently, the Council erred in reserving a future decision about whether Trillium's master plan was consistent with the comprehensive plan's school site dedication policies. Again, we defer to the Council to decide if and when it is prepared to determine whether a master plan is consistent with the comprehensive plan, and accordingly, we affirm its decision to reserve its determination regarding Trillium's consistency with school site dedication policies.

The comprehensive plan provides that, "[n]ew residential developments should take into account the impact they may have on school capacity. If a development is large enough to generate the need, one or more school sites should be dedicated." Comprehensive Plan ch. 5 at 32 (PF 33.5). And by ordinance, the Council must determine whether a neighborhood village master plan application conflicts with the City's adopted plans, policies and ordinances before approving the master plan. OMC 18.02.100; OMC 18.57.080(D)(3). Accordingly, before it could approve the Trillium master plan, the municipal code required the Council to determine whether sufficient school capacity existed to serve Trillium's residents. *See* OMC 18.57.080(D)(3); Comprehensive Plan ch. 5 at 32 (PF 33.5). But because the Council denied the Trillium master plan due to deficiencies in public transit requirements, it declined to reach the merits of the school capacity issue in dismissing the master plan. We hold that DR Horton does not demonstrate error; and we defer to the Council's decision on this issue.

### III. ADEQUACY OF RECORD TO DECIDE CONNECTIVITY ISSUES

Finally, DR Horton claims that the Council erred when it determined that the record was inadequate to determine that Trillium met bicycle and pedestrian connectivity requirements. Specifically, DR Horton asserts that substantial evidence does not support the Council's determination regarding bicycle and pedestrian connectivity. We defer to the Council's determination that it lacked an adequate record to decide that the Trillium proposal was consistent with connectivity requirements.

### A. Standard of Review

In reviewing a LUPA action for substantial evidence, we analyze whether a "sufficient quantum of evidence" in the record could persuade a reasonable person that the declared premise

is true when viewed in light of the whole record, after drawing inferences from the evidence in a light most favorable to the decision by the highest forum exercising fact-finding authority. *Phoenix Dev., Inc.*, 171 Wn.2d at 831. Here, we review this sufficiency challenge, viewing the facts and drawing inferences in a light most favorable to the Council's action that rejected the Trillium master plan and found that the record was inadequate to find consistency with connectivity standards. *See Phoenix Dev., Inc.*, 171 Wn.2d at 831.

## B. Analysis

In its ordinance that denied the Trillium master plan, the Council issued findings. Regarding connectivity, the Council found: "The present record is inadequate to make a determination that the Trillium MPA meets the requirements for bicycle and pedestrian connections set forth in the City Code, including the Engineering Design and Development Standards, and the Comprehensive Plan. However, in light of the Council's decision, a remand is unnecessary." AR at 5983.

The parties interpret this finding differently. But because the finding states that, in light of the finding "remand is unnecessary," the Council implied that it did not reach a final substantive decision but instead left open the possibility of DR Horton supplementing the record at a later time to demonstrate connectivity compliance.

### 1. Connectivity standards

Initially, DR Horton contends that the City lacked any "meaningful, measurable standards governing connectivity." Br. of Appellant at 49. But substantial evidence demonstrates that the City does have measurable plans, policies, and ordinances controlling bicycle and pedestrian connectivity. For example, the City code requires neighborhood villages

to have "direct, convenient pedestrian, bicycle, and vehicular access between residences in the development and village center, in order to facilitate pedestrian and bicycle travel and reduce the number and length of automobile trips." OMC 18.05.020(A)(4).

The City's engineering design and development standards (EDDS), which OMC 12.02.020 incorporates into the City code, also require a street connection every 250 to 350 feet, creating block lengths of 250 to 350 feet on neighborhood collector and local access streets. EDDS 4B.030, Table 3. But, "[w]here larger blocks are necessary due to topography, existing development, or other constraints, intervening public cross-block pedestrian, bicycle, and emergency access will be provided." EDDS 2.040(B)(3)(e).

Moreover, the City's comprehensive plan contains bicycle-pedestrian connectivity standards, requiring "as many connections as possible throughout the network using the street network spacing criteria." Comprehensive Plan ch. 6 at 17 (T 3.13(a)). Another criterion requires developers to "design in as many pedestrian/bike connections as possible." Comprehensive Plan ch. 6 at 18 (T 3.13(h)). It, too, outlines residential street policies and requires that they be designed "to enable people to quickly and easily reach these destinations on foot, bicycle, or in a car or bus." Comprehensive Plan ch. 6 at 20 (T 3.19(g)). And, it requires that "blocks be small enough (e.g., 250 to 350 feet) to create easy travel options for motorized and non-motorized travel. *[Note: Standard blocks in older residential areas in Olympia that are 250 to 350 feet long are considered walkable.]*" Comprehensive Plan ch. 6 at 21-22 (T 3.20(g)) ("Note" contained in original). That same comprehensive plan section calls for a

> network of paved pedestrian and bicycle paths separated, where possible, from motor vehicle travel lanes, to and through existing and future neighborhoods, shopping areas, parks, collector roads and schools. These paths should provide

shortcuts between roads, rather than paralleling them. These shortcut paths may appropriately serve as an alternative to roadway connections between existing local access streets and new streets, depending on the objectives to be furthered by a particular connection.

Comprehensive Plan ch. 6 at 22 (T 3.20(j)).

Again, because these standards are either contained in the City code or comprehensive plans, neighborhood village master plans must be consistent with these standards before master plan approval. *See* OMC 18.02.100; OMC 18.57.080(D)(3). Therefore, the City had measurable connectivity standards that DR Horton needed to satisfy in its Trillium proposal.

## 2. Evidence of connectivity

OSSC entered considerable evidence into the record to demonstrate that the Trillium master plan did not meet connectivity requirements. And now, DR Horton essentially admits that Trillium's connectivity falls short of City requirements when it acknowledges that it "voluntarily incorporated many of [OSSC's] requested pedestrian and bicycle connections into the [Trillium] master plan design." Br. of Appellant at 12. OSSC, however, advocated for only those connections *required* under the City's plans, policies, and ordinances; so, when DR Horton stated that it incorporated many but not all of the required connectivity designs, it admitted that it did not satisfy all of the required connectivity designs.

Though the evidence contained in the record regarding connectivity may have been substantial enough evidence on which the Council could decide that DR Horton provided inadequate evidence to demonstrate consistency with the City's connectivity standards, the Council declined to make a final determination on the matter; instead, it simply stated that DR Horton had not demonstrated that Trillium would be consistent with the comprehensive plan.

We defer to the Council's reasonable determination that, to this point, DR Horton has provided inadequate evidence to demonstrate compliance with City connectivity requirements.

## ATTORNEY FEES

The City and OSSC seek reasonable attorney fees, expenses, and costs as prevailing parties under RCW 4.84.370. Because we affirm the Council's decision, the City is entitled to reasonable attorney fees and costs under RCW 4.84.370(2) as a prevailing party on appeal.

Generally, a prevailing party is one who receives a judgment in its favor. *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 164, 795 P.2d 1143 (1990). If neither party wholly prevails then the party who substantially prevails is the prevailing party. *See Rowe v. Floyd*, 29 Wn. App. 532, 535 n.4, 629 P.2d 925 (1981).

DR Horton claims that OSSC is not entitled to attorney fees "under any circumstance as it has never been a prevailing party and has only ever held 'intervenor' status." Reply Br. at 25. Contrary to DR Horton's argument, intervenors have been awarded attorney fees as prevailing parties in the past. *See Fireman's Fund Ins. Co. v. Nw Paving and Constr. Co.*, 77 Wn. App. 474, 478, 891 P.2d 747 (1995) ("The award of attorney fees is not limited to the judgment debtor, but may be made to an intervening party who prevails."). Here, because we agree with OSSC that DR Horton failed to provide adequate evidence of Trillium's consistency with City connectivity standards, OSSC substantially prevailed on this issue. Accordingly, because intervenors may be prevailing parties, and DR Horton has provided no authority otherwise, we award OSSC attorney fees and costs as a prevailing party intervenor under RCW 4.84.370(1).

No. 43300-1-II

We affirm the Council's action. We award costs and attorney fees to the City and OSSC as prevailing parties on appeal upon their compliance with RAP 18.1.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, J.

We concur:

Worswick, C.J.

Lee, J.P.T.